1 | Jehu Hand, SBN 124016
jehu@jehu.com
2 | Hand & Hand, a professional corp.
24672 San Juan, Suite 204
3 | Dana Point, CA 92629
(949) 489-2400
4 | fax (949) 489-0034
Attorneys for Plaintiffs Robert J. Filiatreaux;
5 | Millenium Group Inc; and Magellan Capital Corp.
Profit Sharing Plan and Trust



FILED
CLERK, U.S. DISTRICT COURT

OCT 2 6 2011

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION        BY DEPUTY

6

7

8

9

10

### UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

11

12

13

14

15

16

17

18

ROBERT J. FILIATREAUX, MILLENIUM
GROUP, INC. and MAGELLAN CAPITAL
CORP. PROFIT SHARING PLAN AND
TRUST

　　　　　　　Plaintiffs,

vs.

DUOYUAN PRINTING, INC., WENHUA
GUO and DOES 1 through 30, inclusive,

　　　　　　Defendants.

**CV 11 - 08859** R SSx

CIVIL ACTION NO.

19

20

21

22

23

24

25

### COMPLAINT

　　　Plaintiffs bring this Complaint against Duoyuan Printing, Inc., Wenhua Guo and Does 1

through 30 inclusive, to recover damages and to compel the holding of an annual shareholder

meeting pursuant to Wyoming Business Corporations Act §17-16-703 and to appoint a custodian

under Wyoming Business Corporations Act §17-16-748. Plaintiffs allege violations of Uniform

Commercial Code Section 8-401 *et seq.*; Section 10(b) of the Securities and Exchange Act of 1934

and Rule 10b-5 promulgated thereunder; breach of contract; and common law conversion.

**PARTIES AND JURISDICTION**

1.      Plaintiff Robert Filiatreaux ("Filiatreaux") is a natural person residing in Riverside County, California.

2.      Plaintiff Magellan Capital Corporation Pension Plan and Trust ("Magellan") is a pension plan and trust with a principal place of business in Riverside County, California.

3.      Plaintiff Millenium Group, Inc. ("Millenium") is a California corporation with principal place of business in Los Angeles, California.

4.      Plaintiff Filiatreaux purchased 37,500 shares of common stock of Defendant Duoyuan Printing, Inc. ("Duoyuan" or "Company") in 1998 (the "Filiatreaux Shares").

5.      Plaintiff Magellan acquired 1,000,000 shares of Duoyuan in 1998.

6.      Plaintiff Millenium acquired 1,000,000 shares of Duoyuan in 2006.

7.      Defendant Duoyuan is a Wyoming corporation whose common stock traded on the New York Stock Exchange under the symbol DYP from November 6, 2009 until April 4, 2011, and now trades on the over the counter market under the symbol DYNP.PK.

8.      Duoyuan is engaged in the business producing and selling printing presses in China. Prior to October 15, 2009, Duoyan was known as Asian Financial, Inc.

9.      Prior to November 2, 2006, Duoyuan's principal place of business was located in Riverside County, California.

10.     Plaintiffs received their shares while Duoyan maintained its principal place of business in Riverside County, California.

11.     Venue is proper in this district pursuant to Cal. Code Civ. P. § 395.5, because Plaintiffs are and were residents of this District at all times relevant to the Complaint; because Defendant's liability to Plaintiffs arose within the district; and because the breach and corresponding injury was suffered herein.

12.     Jurisdiction in this Court is proper against all Defendants pursuant to 28 U.S.C.

§1331, because Plaintiffs have pled for relief pursuant to a federal statute prohibiting fraud in

the securities market; and under 28 U.S.C. §1332 because Plaintiffs are all citizens of the State

of California and Defendant is a citizen of China and Wyoming, and the amount in controversy

exceeds $75,000. Defendant Duoyuan is incorporated in the state of Wyoming and its principal

place of business is in the People's Republic of China; Supplemental jurisdiction over the state

law claims is also proper pursuant to 28 U.S.C. § 1367 because the torts detailed in the state

law claims relate to the same case or controversy as the federal securities law claim in that they

were all part of one overarching fraudulent scheme that operated to the unlawful detriment of

Plaintiffs.

13.     The true name and capacities, whether individual, corporate, associate, or otherwise,

of Defendants Does 1 through 30 are unknown to Plaintiffs at this time, who therefore sued said

Defendants by such fictitious names. Each of the Defendants designated as such is responsible in

some manner for the events and happenings referred to herein. Plaintiffs will request leave of the

court to amend this complaint to insert the true names and capacities of Does 1 through 30 when

that information has been ascertained.

## BRIEF SUMMARY OF FACTS

14.     Defendant Duoyuan was incorporated in 1998. Originally known as Asian

Financial, the Company registered its common stock with the Securities and Exchange

Commission in 1999.  On November 2, 2006, the Company acquired Duoyuan Digital Printing

Technology Industries, (China) Co., Ltd. by issuing new shares equaling 96% of the Company.   A

key term of this transaction was that Duoyuan agreed to register the shares of the Plaintiffs and

all other pre-acquisition shareholders.

15.     The commitment to register the shares of the Plaintiffs and all pre-acquisition

shareholders was a key term relied upon by all Plaintiffs to ratify the acquisition, as it would enable to pre-acquisition shareholders to sell their shares freely when the Company later became listed on a public exchange such as the NYSE.

16.     The obligation to register Plaintiffs' shares is set forth in Section 7.07 of the Equity Transfer Agreement between the parties, which was filed as exhibit 2.1 to a Form 8-K filed with the SEC on September 6, 2006 and is attached as Exhibit A hereto. Plaintiffs relied on this contractually binding promise when they entered into the transaction.

17.     Company shares began to trade on the New York Stock Exchange on November 6, 2009. In accord with its contractual commitment, Duoyuan included Plaintiffs' shares in its original registration statement. (Exhibit B, pg 124) However, just prior to its registration statement going "active," Duoyuan removed Plaintiffs' shares from the final amended registration statement, without Plaintiffs approval and, on information and belief, with the intention to hinder Plaintiffs from being able to sell their shares. The amended registration statement approved by the SEC does not include Plaintiffs' shares. (Exhibit C).

18.     Plaintiff Magellan later sold some shares pursuant to Exchange Act Rule 144, which outlines an exemption from registration requirements for certain types of private placements. Magellan's efforts to mitigate were largely ineffective, however, due to delays related to the drafting of legal opinions which also needed to be approved by Duoyuan pursuant to Rule 144. Furthermore, Duoyuan was not timely in its approval and the share price plummeted during this delay, causing Magellan a loss in excess of $500,000.

19.     Duoyuan imposed additional blocks upon Plaintiffs Filiatreaux and Millenium that continued to stop them from being able to sell their shares. Plaintiff Millennium was unable to sell its shares for over 10 months, resulting in a loss of over $2.5 million. As of the date of this filing, Plaintiff Filiatreaux is still unable to sell his shares, resulting in a loss of

approximately $150,000.

20.    Duoyuan refused to allow Plaintiffs Filiatreaux and Millenium to complete any share transfers, claiming that their certificates were not valid, despite their direct knowledge that these certificates were validly issued and that Plaintiffs Filiatreaux and Millenium were legitimate shareholders as demonstrated on Duoyuan's own shareholder and registration statements dating back to 2006.

21.    Duoyuan, through its CFO William Suh, informed Plaintiffs that its prior transfer agent Mellon Bank had mailed out new certificates pursuant to a reverse stock split, and that only the Mellon certificates would be honored henceforth.

22.    Plaintiffs Filiatreaux and Millenium informed CFO William Suh that they and several other shareholders had never received the Mellon certificates, and that they had not been notified by Mellon or by anyone else that new certificates had been issued consequent to the reverse split.

23.    Plaintiffs also explained to Suh, orally and in writing, that the execution of the reverse stock split was riddled with catastrophic errors arising from the the Company's inadvertent appointment of two transfer agents. As a result of miscommunications related to the duplicative appointment of multiple transfer agents, Plaintiffs had not surrendered the pre-split certificates as required by Duoyuan's own articles of incorporation and by Mellon's own protocols for completed re-issuances. In short, Plaintiffs explicitly detailed the Company's non-compliant missteps and explained the consequences that were likely to arise from those missteps. Plaintiffs' entreaties fell on deaf ears.

24.    Plaintiffs further informed Duoyuan's CFO William Suh of their desire and legal right to sell their shares and alleged that Duoyuan's inaction in these circumstances amounted to an unlawful restraint on plaintiffs' right to sell their own shares.

25.     Plaintiffs implored Duoyuan to honor the original certificates. In exchange, Plaintiffs offered to fully indemnify the Company for any potential losses that might arise from the Company honoring the outdated certificates.

26.     Duoyuan CFO William Suh acknowledged that Plaintiffs were legitimate shareholders who were being unlawfully blocked from selling. Despite this acknowledgement, however, Suh further explained that Duoyuan felt the transfer agent was ultimately to blame and should therefore bear the cost of making amends.

27.     Suh later indicated that Duoyuan and its transfer agent were negotiating a resolution amongst themselves - one that would inure to the benefit of Plaintiffs. Despite these promises, a resolution would not materialize for 7 months, not until after Duoyuan's stock price had plummeted. By this time Plaintiffs had suffered irreversible market losses in an amount currently estimated at $2.65 million, related to Duoyuan's unlawful delay in issuing new certificates and/or otherwise registering Plaintiffs' shares.

28.     Ten months after imposing the de-facto stop orders on Plaintiffs' certificates, Duoyuan finally accepted responsibility for the miscommunications by and amongst the transfer agents and provided replacement certificates coupled with a promise that these new certificates would be honored by the Company.

29.     By the time Duoyuan offered to cure, the Company and its officers were subject to class action lawsuits for securities fraud and its share price had fallen by over 75%.

30.     Nine months after Plaintiffs originally suggested the idea, Duoyuan finally agreed to resolve the issue on the terms as originally proposed. Plaintiffs signed declarations and indemnification provisions indicating that they had not received new certificates in the mail. Duoyuan then issued replacement certificates.

31.     Duyouan's delay in issuing the new certificates proximately caused Plaintiffs'

aggregate losses in an amount of $2.65 million.

32.    Plaintiff Filiatreaux has been further damaged as Duoyuan has refused to issue a replacement certificate in his name.

33.    In 2009, Plaintiff Filiatreaux had his shares held at the clearing firm National Financial Services. Since that time, he closed his account with National Financial Services.

34.    At Plaintiff Filiatreaux's request, Duoyuan sent a replacement certificate to Filiatreaux, but, contrary to his instructions, titled the certificate in the name of National Services.

35.    Filiatreaux cannot tranfer this certificate as it is not in his own name and National Financial Services has not been helpful despite his requests.

36.    Duoyuan has refused to issue a replacement certificate to Plaintiff Filiatreaux despite Filiatreaux's repeated requests that it do so.

37.    Once again, despite its knowledge that Filiatreaux is the rightful owner of the certificate, Duoyuan has refused to timely cure the error and instead points a finger at the transfer agent and refuses to take responsibility for a costly miscommunication of its own making. Plaintiff Filiatreaux will be left bearing depreciated shares as a result of the delay.

38.    Plaintiff has been injured as a result of Defendants' various breaches of their duty of care, which have left him unable to sell or transfer his shares in a timely fashion. The price at which Company shares were trading dropped significantly while sale of these shares was unlawfully blocked consequent to Duoyuan's unlawful conduct. Plaintiff Filiatreaux has been left bearing the loss resulting from the drop in the share price.

39.    Plaintiff Filiatreaux has filed this suit in order to recover losses caused by Duoyuan's unlawful conduct.

## FACTUAL BACKGROUND

40.     On information and belief, in 2007 Duoyuan had not one, but two transfer agents: Executive Registrar and Transfer ("Executive"), with a principal place of business located in Englewood, Colorado, and Bank of New York Mellon Corporation, with a principal place of business located in New York City, also now known Mellon Bank ("Mellon").

41.     Mellon was later terminated as transfer agent and according to the Form S-1 filed by Duoyuan on September 9, 2009, American Stock Transfer ("AST"), based in New York, was appointed the new Company transfer agent at that time. The Form S-1 made no mention of Executive or the fact that it had been previously appointed as a transfer agent for the Company.

42.     Plaintiff Filiatreaux received a new share certificate following the Duoyuan acquisition. Certificate # 66. (Exhibit D) This certificate is signed by Executive's authorized representative and also by Mr. Guo, the chairman and majority owner of Duoyuan. Plaintiff Filiatreaux originally deposited this certificate into his account at TD Ameritrade in December 2007, and the shares were credited to Plaintiff Filiatreaux's account at that time.

43.     In November, 2009 the Depository Trust Company credited TD Ameritrade with the 37,500 Filiatreaux Shares. Exhibit E is a letter to Plaintiff Filiatreaux from TD Ameritrade acknowledging the shares on the terms detailed above.

44.     Plaintiff Filiatreaux sold 1,500 of these shares on January 8, 2010 for net proceeds of $15,000. On February 24, 2010, Plaintiff Filiatreaux requested that 15,000 of the Filiatreaux Shares be transferred electronically to his account at Raymond, James.

45.     On March 8, 2010, however, TD Ameritrade was notified that Duoyuan's new transfer agent, American Stock Transfer, had rejected Certificate # 66.

46.     In light of AST's rejection of Certificate # 66, TD Ameritrade demanded that Plaintiff Filiatreaux return the 15,000 Filiatreaux Shares which had been sent to Raymond,

James. In a continued effort to mitigate its own potential losses related to the ineffective transfer of shares embodied in Certificate # 66, TD Ameritrade bought 1,500 shares of Company stock to cover those it previously sold while under the impression that certificate # 66 was valid. TD Ameritrade demanded, and continues to demand that Plaintiff Filiatreaux pay it back for the "buy in."

47.      When Plaintiff Filiatreaux learned of AST's rejection of Certificate # 66, he informed Duoyuan's Chief Financial Officer, William Suh that Duoyuan was incorrectly dishonoring his share transfer.

48.      Despite being made aware of the circumstances surrounding the rejection of Certificate # 66 and the larger problems implicated by the same, Mr. Suh refused to help Plaintiff Filiatreaux in an expeditious manner and instead placed all blame on the transfer agent.

49.      Furthermore, Mr. Suh refused to recognize the critical problems brought to his attention at the time – problems which arose from the fact that two transfer agents had been appointed by the Company. Because these transfer agents were not in communication or even aware of each other's activities, there were millions of duplicate shares in existence. This error underscored Duoyuan's serious deficiencies in internal controls.

50.      The latter deficiency centers on the fact that, on the issuance of each quarterly and annual financial statement, a public company chief financial officer is required to reconcile the number of shares outstanding on the company's records with those at the transfer agent. Since Duoyuan was ignorant of the fact that it had appointed two transfer agents, it was unable to have reliable internal controls. Mr. Suh was unable or unwilling to address any of these complications which arose from critical errors by Company management, and which operated to the significant financial detriment of Plaintiff Filiatreaux and public shareholders.

51.     The complications referenced above were compounded by the fact that on July 17, 2007, Duoyuan effected a 1-for-2.68189924 reverse stock split. The effect of the reverse stock split was to cause each 2.68189924 Duoyuan shares to be converted into one Duoyuan share (The 37,500 Filiatreaux Shares set forth in ¶ 1 of this Complaint are measured in "pre-split" shares, and reference Plaintiff Filiatreaux's original 37,500 shares, which would result in 13,983 new, "post-split" shares; likewise, Magellan's 1,000,000 shares became 372,871 shares and Millennium's 1,000,000 shares became 372,871 shares).

52.     Duoyuan management, however, apparently still ignorant of the fact it had appointed two transfer agents, processed the reverse stock split only through Mellon Bank and gave no notice to Executive. As a result, Certificate # 66 issued to TD Ameritrade (for Plaintiff Filiatreaux) on December 17, 2007, representing 37,500 "pre-split" shares, did not reflect the reverse stock split effected in July 2007 as it should, which would have reduced the number of shares embodied in the certificate to 13,983.

53.     The procedure required to be followed by a transfer agent such as Mellon with respect to a reverse stock split is to send, to each shareholder of record, a Letter of Transmittal. A Letter of Transmittal utilized by Mellon in another, unrelated transaction is attached as Exhibit F to this Complaint.

54.     The Letter of Transmittal, in summary, requires that, before a replacement certificate is sent out, the shareholder must complete the Letter of Transmittal and send it to Mellon *together with the surrender of the existing certificates - before any new certificates are issued and sent out.*

55.     Neither Mellon nor Duoyuan sent out any Letter of Transmittal or any notification that new certificates were being issued to replace the existing certificates.

56.     On or about October 1, 2007, Mellon *mailed* out stock certificates to the

shareholders of Duoyuan, to their last known addresses of record, without requiring surrender of existing certificates and without confirming current addresses, contrary to their internal protocol and industry standard.

57.     These certificates were sent not by certified mail but by regular mail.

58.     Plaintiffs Filiatreaux and Millenium never received any notification from Mellon or Duoyuan relating to the reverse stock split and in fact were unaware that new certificates had been issued or sent.

59.     Millennium's certificate was not sent to Millennium's current or former address.

60.     Plaintiffs contacted Duoyuan and  American Stock Transfer about the de facto stop order which had been placed on their shares.  Both Duoyuan and AST indicated that in order to receive "new" certificates, they had to purchase an expensive indemnity bond. Furthermore, Plaintiffs were expected to execute an "affidavit of loss," under penalty of perjury, indicating that that they and others had "lost" the Mellon certificates.

61.     Plaintiffs informed American Stock Transfer and Duoyuan that they could not lawfully provide such an affidavit because none of them had  lost their new certificates.  To the contrary, they had never received them at all.

62.     Plaintiffs repeatedly contacted Duoyuan's chief financial officer William Suh, seeking atonement.

63.     At the time Plaintiffs made their first request that Duyouan take corrective action, the Company's common stock was trading between $10 and $11 per share.

64.     Rather than taking immediate emergency measures to rectify their obvious errors, Duoyuan implemented a systematic scheme of stall tactics and evasion.  These evasive maneuvers consisted primarily of pointing the finger at the transfer agent and otherwise refusing to accept responsibility for its own errors.

65.     On November 8, 2010, Duoyuan finally issued replacement certificates. By that time, Duoyuan and its officers were subject to a class action lawsuit, were delinquent in making their SEC filings, and the stock price had fallen by over 75%. As of August 12, 2011, the last sale of Duoyuan common stock was executed at \$.42 per share.

66.     Nevertheless, to this date, Plaintiff Filiatreaux himself has not received his replacement certificate. On the records American Stock Transfer received from Mellon, Plaintiff Filiatreaux is not listed as a shareholder; Plaintiff Filiatreaux's shares are still in the name of National Financial Services, the clearing firm where Plaintiff Filiatreaux had his original share certificate #66 shares deposited years ago.

67.     Despite the protest of Plaintiff Filiatreaux, Duoyuan issued the replacement certificate for 13,983 in the name of National Financial Services.

68.     National Financial continues to take the position that it transferred the subject shares to Plaintiff Filiatreaux years ago, and refuses to endorse the certificate for the Filiatreaux Shares to Plaintiff Filiatreaux. National Services cannot be correct in this assertion, since in order to transfer the 13,983 shares to Plaintiff Filiatreaux, it could only have done so through Duoyuan's transfer agent. Yet Duoyuan's transfer agent still shows National Services as the shareholder of record.

69.     While Defendants pointed accusatory fingers at one another and ceaselessly sought to pass the blame in a dismal comedy of errors, the price of Company stock crashed from \$11/share to \$0.42/share, leaving Plaintiff Filiatreaux bearing a loss of approximately

$139,550.34.[1] The size of this loss is subject to the vicissitudes of the market and Plaintiff Filiatreaux prays for leave of the court to restate the precise amount lost when his shares are finally delivered and sold.

### FIRST CAUSE OF ACTION

### UNIFORM COMMERCIAL CODE § 8-401 *et seq.* – AGAINST DUOYUAN

70.     The above allegations are incorporated herein by this reference.

71.     Plaintiffs are rightful owners of the shares described in the preceding paragraphs. UCC § 8-401 provides that "if a certificated security in registered form is presented to an issuer with a request to register transfer, . . . the issuer shall register the transfer as requested" if the instruction is made by an appropriate person and other conditions not relevant here are satisfied.

72.     Plaintiff Filiatreaux, through his broker TD Ameritrade, presented his certificated securities as embodied in Certificate # 66, for transfer. Certificate # 66 was validly issued by Duoyuan, by and through one of its duly appointed transfer agents, and bore the signature of its officer.

73.     Plaintiff Filiatreaux provided all required endorsements and otherwise complied with the prerequisites for registration of the transfers imposed by Article 8 of the Uniform Commercial Code.

74.     Plaintiffs Millenium and Megallan also made timely demand that their stock certificates be transferred.

---

[1] Plaintiff Fileatreaux's losses must be calculated based on the difference in price between when he first tried to sell the shares but was inhibited from doing so pursuant to tortious conduct on the part of the Company and the price at which those shares are trading when he finally sells. He first tried to sell early in 2011, around when the shares reached a peak price of $10.41/share on January 12, 2011. Around the time of filing on August 17, 2011, Company shares were trading at $0.43/share. Plaintiff Fileatreaux's shares dropped in value by $9.98/share during the period of the unlawful hold ($10.41 - $0.43 = $9.98). When multiplied by the number of shares Plaintiff Fileatreaux held, this diminution in value yields an aggregate loss of $139,550.34 ($9.98/share loss X 13,983 shares = $139,550.34).

75.   Defendant Duoyuan knowingly refused to register the transfer of the shares belonging to all Plaintiffs, and further refused to issue a new certificate reflecting the post-split shares, in breach of its duty to do so pursuant to UCC § 8-401 and related provisions.

76.   The Depository Trust Company will not honor certificates that have not been updated to reflect a reverse split.  DTC approval is essential to effectuate a sale.

77.   Duoyuan's unlawful refusal to issue updated certificates, therefore, rendered Plaintiffs' shares inalienable and worthless.

78.   Plaintiffs Millenium and Magellan mitigated their losses by selling stock in Rule 144 private placements, but sill ultimately bore a loss of approximately $2,500,000 dollars due to diminution of share price during the unlawful delay.

79.   Plaintiff Filiatreaux also has been damaged by the Defendants' breach of the UCC in an amount to be proven at trial but which exceeds $75,000, when the market value of Plaintiff Filiatreaux's shares dropped precipitously while sale of his shares was unlawfully blocked as a result of Duoyuan's unlawful conduct.

## SECOND CAUSE OF ACTION

**SECTION 10(b) and RULE 10b-5 of the SECURITIES EXCHANGE ACT of 1934 – AGAINST DEFENDANT DUOYUAN AND AGAINST DEFENDANT GUO AS A CONTROL PERSON PURSUANT TO SECTION 20A OF THE EXCHANGE ACT.**

80.   The above allegations are incorporated herein by this reference.

81.   In its scheme to deprive Plaintiffs of the ability to register their shares in the Form S-1 filed by the Company and to sell his shares on the public market, in order to artificially control the market price for its common stock, Defendants Duoyuan and Guo, directly and indirectly, with scienter, including with recklessness disregard, in connection with the purchase and sale of securities (See SEC v. Zanford, 535 U.S. 813 (2002)), by use of the

means or instrumentalities of interstate commerce, or of the mails, have employed devices, schemes or artifices to defraud; have made untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or have engaged in acts, practices or courses of business which have been and are operating as a fraud upon the purchasers or sellers of such securities.

82.   Defendant Mr. Guo misrepresented to Plaintiffs that their securities would be registered at the time when the Company filed its first registration statement.

83.   This representation was made in relation to the purchase or sale of a security interest because it was made in furtherance of a contemplated reverse merger that would result in a substantial share issuance to the shareholders of pre-merger Duoyuan, all affiliates of Mr. Guo.

84.   Plaintiffs reasonably relied on these representations in that they expected these securities to be registered in the first registration statement by the Company and would not have otherwise voted in favor of the merger.

85.   Defendant Mr. Guo knew, or should have known at the time of purchasing the securities, that his Company lacked the internal controls and corporate governance necessary in order to follow through with the promise to register Plaintiffs' shares.  In other words, the promise was made in reckless disregard of Plaintiffs' rights to the extent that it was not accompanied by any meaningful effort to ensure that the conditions of the promise were fulfilled – the Company did not take reasonable care to ensure that the shares were actually registered in the Form S-1 filed by the Company on March 22, 2007.

86.   Plaintiff Filiatreaux was injured in an amount to be proven at trial, in the proximity of $139,550.34, when Duoyuan refused to register Plaintiff Filiatreaux's shares as

part of its first registration statement. As a result, Plaintiff Filiatreaux's free trading shares were not timely issued, as was the expectation based on promises made at the time of the merger. Rather, Plaintiff Filiatreaux was left holding restricted shares that were inalienable due to complications arising out of Duoyuan's negligent appointment of two transfer agents, as detailed elsewhere in this Complaint. Registration of the shares would have rendered them immediately alienable because AST, the new transfer agent, would have issued new certificates to all the individuals included in the S-1 and the confusion would have been definitively resolved and securities timely delivered to Plaintiff Filiatreaux.

87. Plaintiffs Millenium and Magellan were also left holding restricted shares as a result of Defendants' unlawful conduct. As a result, they were forced to sell shares at a discount and with higher transaction costs pursuant to a Rule 144 private placement, rather than an open market sale and were damaged thereby.

88. On information and belief, Defendants Guo and Duoyuan refused to address the obvious problems arising from the simultaneous appointment of two transfer agents. On information and belief, they did so because, as a major shareholder of Company stock, Mr. Guo did not want to spend the money required to rectify the problem. This type of expenditure, or "clean up" cost would tip off auditors to the existence of the major problems and lack of internal controls at the Company. Once the auditors became aware, they would force disclosure of the "material adverse event." Said disclosure would crush the stock price and result in a massive devaluation of Defendant Guo's holdings in Company stock. In an effort to avoid personal financial loss, he resisted disclosure despite his obligation as an officer of a publicly traded Company to make this information public pursuant to §§ 13 and 15(d) of the Securities Exchange Act of 1934.

89.     Plaintiffs were further injured when the value of the shares dropped prior to their registration and delivery of share certificates to Plaintiffs.

90.     By reason of the foregoing conduct, Defendant Duoyuan has violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. As a direct and proximate result of Defendant Duoyuan's wrongful conduct, Plaintiffs sustained and will continue to sustain damages in excess of $75,000, in that sale of their shares has been materially delayed and/or denied altogether.

## THIRD CAUSE OF ACTION

## CONVERSION – AGAINST ALL DEFENDANTS

91.     The above allegations are incorporated herein by this reference.

92.     Plaintiffs owned or were entitled to possession of the shares of Duoyuan stock described in the preceding paragraphs.

93.     Defendants improperly exercised dominion or assumed control over these shares when they refused to provide valid stock certificates embodying Plaintiffs shares despite the fact that Plaintiffs were the rightful owner of those shares.

94.     Plaintiffs were injured in an amount to be proven at trial, which exceeds $75,000 when they were unable to timely sell or transfer their shares for lack of a valid share certificate.

95.     Defendant Duoyuan's conduct constitutes oppressive, all with the intention of causing injury to Plaintiffs, and was fraudulent and malicious conduct as defined in Cal. Civ. Code § 3294.

96.     Plaintiffs should recover, in addition to actual damages, exemplary and punitive damages according to proof, pursuant to Cal. Civ. Code § 3294.

97.     This despicable conduct subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights so as to justify an award of exemplary and punitive damages.

## **FOURTH CAUSE OF ACTION**

### **BREACH OF CONTRACT – AGAINST ALL DEFENDANTS**

98.    Duoyuan and Guo offered to purchase a controlling interest in Plaintiffs' shell company for consideration that included, among other things, a promise to register Plaintiffs' shares as part of its first registration statement.

99.    Plaintiffs reasonably relied on this promise when they accepted the offer and voted their ownership interest in favor of merging the shell with privately held Duoyuan Digital Printing Technology Industries, (China) Co., Ltd, the privately held predecessor to Duoyuan.

100.    Defendants knew or should have known based on the surrounding circumstances of the merger and common industry knowledge, that the promise to timely register Plaintiffs' shares was a material term of the merger agreement and that it formed a contractually binding obligation to "piggy back" Plaintiff s shares onto the company's first registration statement.

101.    Duoyuan breached this contractually binding obligation when it failed to register Plaintiffs' shares as part of the Company's first registration statement on September 9, 2009.

102.    Plaintiffs were injured in an amount to be proven at trial when Duoyuan's refusal to register the shares in breach of its contractually binding promises led to major miscommunications between various transfer agents and clearing houses that precluded Plaintiffs from being able to sell or transfer their shares.

103.    If Plaintiffs' shares had been registered, then their names and the size of their respective holdings would have appeared on the public filings and any confusion amongst transfer agents would have been easy to rectify based on the public records.

104.    Duoyuan's failure to register allowed the confusion and miscommunication to continue indefinitely such that Plaintiffs were deprived of the ability to sell their shares in a timely fashion and suffered economic injury in an amount to be proven at trial, which is in

excess of $75,000, when the value of their shares dropped while sale of the same was
unlawfully blocked.

## FIFTH CAUSE OF ACTION

### TO ISSUE A MANDATORY INJUNCTION OBLIGATING THE COMPANY TO HOLD AN ANNUAL MEETING WHERE SHAREHOLDERS MAY NOMINATE AND VOTE ON THE ELECTION OF NEW DIRECTORS – AGAINST DUOYUAN

105.    The above allegations are incorporated herein by this reference

106.    Defendant Duoyuan has failed to convene its annual shareholders' meetings in both 2010 *and* 2011. The last meeting was held in October, 2009.

107.    Since filing its last report, which is the Quarterly Report on Form 10-Q for the quarter ended March 31, 2010, Defendant Duoyuan, a publicly traded Wyoming corporation, also has failed to submit certain annual, quarterly, and other periodic reports, including financial statements, required to be filed with the U.S. Securities and Exchange Commission ("SEC").

108.    By failing to hold an annual shareholders' meeting, Defendant has deprived Plaintiffs and other shareholders of their right to nominate and vote upon directors for Duoyuan's board.

109.    Plaintiffs seek an order pursuant to Wyo. Stat. Ann. §17-16-703 (2011), summarily compelling Defendant Duoyuan to hold the required shareholders' meeting on a date certain, to be fixed by the Court, in accordance with Wyoming law, and to issue an additional order that shareholders must be allowed to vote on the election of an entirely new board or directors pursuant to Wyo. Stat. Ann. §17-16-703(b) (2011).

110.    Duoyuan is a corporation organized and existing under the laws of the State of Wyoming.

111.    The Wyoming statute provides that the superior court of the county in which a

corporation's registered office is located may, after notice to the corporation, summarily order a meeting to be held on application of any shareholder of the corporation entitled to vote in the election of directors at an annual meeting, if an annual meeting was not held within the earlier of six months after the end of the corporation's fiscal year or fifteen months after its last annual meeting or approval or corporate action by shareholder consent in lieu of such a meeting.

112.    An annual Duoyuan shareholders' meeting was not held within six months after the end of Duoyuan's 2008 fiscal year.

113.    An Annual Duoyuan shareholders' meeting was not held within fifteen months after its last annual meeting or approval of corporate action by shareholder consent in lieu of such a meeting.

114.    Wyo. Stat. Ann. §17-16-703 (b), also provides that the court may, after notice to the corporation, fix the time and place of the meeting, determine the shares and shareholders entitled to participate in the meeting, specify a record date for determining shareholders entitled to notice of and to vote at the meeting, prescribe the manner, form, and content of the meeting notice, fix the quorum required for specific matters to be considered at the meeting, or direct that the votes represented at the meeting constitute a quorum for approval of those matters, and enter other orders necessary to accomplish the purpose or purposes of the meeting.

115.    Duoyuan has not set a date for an annual meeting of shareholders in 2010.

116.    Duoyuan did not hold an annual meeting within 15 months after its last annual meeting.

117.    Duoyuan has not taken any action by written consent to elect Duoyuan directors in lieu of an annual meeting.

118.    Duoyuan should be compelled to schedule and hold an annual shareholders' meeting on a date certain, pursuant to Wyo. Stat. Ann. §17-16-703 (2011).

119.   The Court should exercise the powers afforded by statute to the Wyoming

District Court pursuant to its supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

## SIXTH CAUSE OF ACTION

### FOR A MANDATORY INJUNCTION APPOINTING A CUSTODIAN TO PRESERVE CORPORATE ASSETS AND MANAGE COMPANY BUSINESS PENDING A FULL HEARING ON THE MERITS – AGAINST DUOYUAN

120.   The above allegations are incorporated herein by this reference

121.   Defendant Duoyuan dismissed its independent certified accounting firm,

Deloitte Touche Tohmatsu CPA Ltd., on September 6, 2010. In the Current Report on Form 8-

K reporting this dismissal (Exhibit G), Duoyuan explained that, "Deloitte requested that the

Company provide permission to access original bank statements to complete its audit

procedures to verify the identity of certain individuals and entities associated with third party

distributors and vendors."

122.   According to the Form 8-K, Duoyuan refused to provide Deloitte with an

explanation regarding uncorroborated offshore expenditures totaling $3,760,000 in 2009 alone.

123.   The Form 8-K continues, "Deloitte received information regarding certain

distributors and vendors that appeared inconsistent with certain information that the Company

had provided."

124.   "Deloitte advised [Duoyuan's] Audit Committee that it was informed by the

Chief Executive Officer and Chief Financial Officer of the Company that they felt they did not

have access to the information on the open matters referred to above nor were they in a position

to assist the investigation."

125.   "Deloitte expressed its concerns as to the impact of this on its ability to rely on

the future representations from those members of management that it would otherwise seek to

obtain as part of its normal audit procedures."

126.    Deloitte never received a report from the audit committee that addressed the inconsistencies referenced above to its satisfaction and Deloitte was subsequently dismissed by the Company.

127.    As a result of Duoyuan's action in dismissing Deloitte, four independent directors, the Chief Executive Officer and the Chief Financial Officer have all resigned.

128.    Duoyuan has not yet appointed a successor auditor and has not filed any audit of its financial statements for the years ended June 30, 2010 or 2011 as required by the SEC.

129.    The nature of Duoyuan's intransigence in providing information as to payments to distributors and vendors, and in not completing its audit, strongly suggests that Company management seeks to hide the identity of the payees who received millions of dollars in payments from the Company and further suggest these unidentified payees are Company insiders or related parties.

130.    Since Duoyuan dismissed Deloitte for apparently looking too closely into the payees of the $3,760,000 in payments, and has failed to file its audit, the trading price of the Common Stock has fallen to $.42 a share; it was formerly trading at a price exceeding $11 per share.

131.    Duoyuan has been delisted from the NYSE.

132.    Shareholders remain uninformed regarding Duoyuan's internal affais, and it is possible that the corporation is being looted by its insiders.

133.    Shareholders have been unlawfully deprived of their right to vote in a new board of directors to shake up management and right the ailing Company.

134.    Wyoming Business Corporations Act §17-16-748 provides that on application of a shareholder, the court may appoint a custodian over the corporation's affairs if it is established, after notice and a hearing, that the "directors or those in control of the corporation are acting

fraudulently and irreparable injury to the corporation is threatened or being suffered." Wyo. Stat. Ann. § 17-16-748(a)(ii) (2011). The statute give the court power to appoint a custodian with "jurisdiction over the corporation and all of its property, wherever located." Wyo. Stat. Ann. § 17-16-748(b)(iii) (2011).

135. Deloitte's dismissal consequent to a disagreement about $3.7 million dollars of undocumented expenditures and the Company's refusal to comply with SEC reporting requirements or to hold a shareholder meeting constitute prima facie grounds for the appointment of a custodian pursuant to Wyoming law.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and request relief as follows:

(a) that a judgment be entered against Defendants, jointly and severally, for all damages sustained by Plaintiffs as a result of Defendants' failure to issue valid stock certificates representing the shares owned by them;

(b) that a judgment be entered against Defendants, jointly and severally, for all damages sustained by Plaintiffs as a result of Defendants refusal to register the shares in breach of the promises made at the time of purchase;

(c) that the Court order an annual meeting to be held, and fix the time and place of the meeting, determine the shares and shareholders entitled to participate in the meeting, specify a record date for determining shareholders entitled to notice of and to vote at the meeting, prescribe the manner, form, and content of the meeting notice, fix the quorum required for specific matters to be considered at the meeting, or direct that the votes represented at the meeting constitute a quorum for approval of those matters, and enter other orders necessary to accomplish the purpose or purposes of the meeting;

1     (d)  that the court appoint a custodian over Duoyuan's affairs, with full

2 authority to take whatever corporate action necessary to preserve the corporate assets wherever

3 located, and to carry on the business of the corporation until a full hearing is held;

4     (e)  that all costs of this action, including Plaintiffs' reasonable attorneys' fees,

5 be taxed to Defendants;

6

7     (f)  that a judgment for punitive damages be awarded against Defendants,

8 jointly and severally;

9     (g)  that the Court award Plaintiffs such other and further relief as it shall

10 deem appropriate in the sound exercise of its discretion.

11

12

13

14 DATED: October 26, 2011

15

16 By:  /s/ Jehu Hand
17     Jehu Hand, SBN 124016
      Hand & Hand, PC
18     24672 San Juan Avenue, Suite 204
      Dana Point, CA 92629
19     T: (949) 489-2400
      F: (949) 489-0034
20     jehu@jehu.com
      Attorneys for Plaintiffs

21

22

23

24

25